State vs. Hart.

No. 10,652.

STATE OF LOUISIANA VS. MAURICE J. HART.

1. It appearing that constitutional bonds which had been prepared by the proper officers appointed by law for that purpose, possessing all the *indicia* of genuine bonds of the State, had been delivered into the custody of the State Treasurer for the purpose of making an exchange thereof for consolidated bonds of the State, in pursuance of the provisions of the Constitution and law, and that the said Treasurer had fraudulently and illegally entered in the blank spaces or shields upon said constitutional bonds numbers purporting to indicate the numbers of the consolidated bond surrendered in exchange therefor, and that he had subsequently and surreptitiously issued and placed same into circulation as *bona fide* and genuine obligations of the State, same are fatally stricken with absolute nullity in their inception, and antecedent to their issuance, and being placed in circulation as unconditional promises of the sovereign *to* pay.

2. Such paper is void in the hands of any holder, as it is the settled rule of the law merchant that when it is shown that the instrument was given for a consideration which, by statute, is declared void, the original taint follows it, and it is void in the hands of every holder, however innocent, and that no party can enforce a negotiable instrument if it be not genuine or if it be executed by a party *incapable of entering into the contract in which it was given.*

3. But the rule of law is, as established by the weight and current of authority, as well as the law merchant, that the fraud which shifts the burden of proof upon the holder to establish the *bona fides* of his acquisition must be in the consideration or the representations used in obtaining the execution of the instrument, and not in the after breach of trust in diverting it from the uses for which it was intended.

4. In order to constitute a valid security, any bond or negotiable obligation of the State must be issued on authority of the Constitution and statute law of the State; and the powers and duties of officers and agents of the Government, whether Federal or State, are defined by statute, which is notice to the world of the limitations that are placed upon their authority.

APPEAL from the Civil District Court for the Parish of Orleans. *King, J.*

State vs. Hart.

*M. J. Cunningham*, Attorney General, and *Walter H. Rogers* for Plaintiff and Appellee:

The State may not be sued in reconvention without her consent.

Forged instruments convey no title. State bonds are not negotiable instruments in the sense of the law merchant. To so denominate them is an abuse of their true character and purpose.

The government does not undertake to guarantee to any person the fidelity of the officers and agents it employs.

This action is similar to the case of the State of Louisiana vs. Laura Gaines, No 10,619 of the docket of this court, now pending on rehearing.

As to the character of the bonds (constitutional, issued under the terms of Act 121 of 1880) the facts are identical. The State found some $54,000 of these bonds in the possession of the defendant, caused them to be sequestered, and they are now in the hands of the, sheriff. The case was tried in the District Court before a jury and there was a verdict for plaintiff and judgment accordingly.

---

*Farrar, Jonas & Kruttschnitt* for Defendant and Appellant:

1. Under Act 121 of 1880, p. 154 of the Acts of that year, bonds of the State, perfect in every respect and ready to be issued, were delivered to the Treasurer of the State of Louisiana, who had the power, without the concurrence, knowledge or consent of any other official whomsoever, to issue such bonds in exchange for consolidated bonds of the State of Louisiana, and the law provided for no record whatsoever to be kept in the Treasurer's office of the fact of any exchange of bonds, nor did it require the performance of any formalities of any kind whatsoever in reference to such issue, save the trifling one of identifying the new bond with the old one for which it was exchanged, by placing a number upon the new bond the same as the one on the bond for which it was given in exchange.

2. When a State enters the markets of the world to borrow money or to pay her debts in bonds or commercial paper of any form transferable by endorsement or delivery, she becomes subject to the same rules of the law merchant that affect or operate on private persons dealing in the same class of paper, by which rules any "innocent holder before maturity" is exempt from inquiry into the circumstances under which the obligation was first put into circulation. Floyd Acceptance, 7 Wall. 675; Cooke vs. United States, 91 U. S. 396; Murray vs. Charleston, 96 U. S. 445; Louisiana vs. Jumel, 107 U. S. 740; United States vs. Bank of Metropolis, 15 Pet. 392; United States vs. State Bank, 96 U. S. 30; Morgan vs. United States, 113 U. S. 483.

3. When commercial paper is signed by one person purporting to bind another, the holder must, at his peril, see that the authority to issue the paper exists, but if the authority does exist, he is not bound to inquire whether or not it has been properly exercised.

4. The bonds in this case having been issued by the officer authorized by law to issue them, and in manner and form required by law, are in the hands of any *bona fide* holder for value valid and legal obligations of the State, even though fraudulently issued by the Treasurer. The power to issue existed, however wrongful its exercise may have been. The holder was bound to see that the power existed; he was not bound to see that it was properly exercised.

5. Even if it be assumed that the State can repudiate these obligations, by show-ing that the Treasurer issued the bonds fraudulently, and for a different pur-pose than that prescribed by the Constitution and the Act of 1880, nevertheless plaintiff is entitled to recover a most only $31,000 of bonds out of the $54,000 sued for, because no evidence whatever is produced tending to show the rest of the bonds to have been fraudulently issued by the Treasurer.

6. Defendant is a *bona fide* holder, for value, of these bonds, acquired by him be-fore maturity, unaffected by any knowledge of the frauds of the State Treas-urer, and in his hands they are valid obligations of the State.

7. The State is not authorized in law or in equity to invoke judicial process to wrest from the hands of her apparent creditor the sole evidence of the latter's claim against her.

The opinion of the court was delivered by

WATKINS, J.    Claim is made of the defendant for the restitution to the State treasury of the aggregate amount of *sixty-one thousand dollars* of alleged *fraudulently issued* and *illegal constitutional bonds of the State of Louisiana*, of the denomination of one thousand dol-lars and five hundred dollars respectively, on the substantial aver-ment that all legal and valid bonds of the State are by law entrusted to the care and custody of the State Treasurer for safe keeping, and that, in violation of his trust, one E. A. Burke, Treasurer, did ille-gally and fraudulently embezzle and convert to his own use, $71,000 of *certain* constitutional bonds, taking same from the treasury of the State and placing them in the hands of the defendant and other per-sons, from whom he obtained large sums of money thereon.

More specifically stated, the averments of the State's petition are, that in pursuance of the *constitutional* debt ordinance, the issuance of certain bonds, known as constitutional bonds, was authorized, and outstanding bonds of the State, known as *consolidated bonds*, were permitted to be given in exchange therefor, at 75 *per centum* of their face value.

That the State caused $7,000,000 of such *constitutional* bonds to be engraved; and of those bonds the Auditor and Treasurer presented to the Governor for his signature $621,000, and he signed same, and caused the great seal of the State to be thereto affixed; and, when thus completed and perfected, same were turned over to E. A. Burke, Treasurer, for the purpose of consummating an exchange thereof for consolidated bonds.

That *consolidated* bonds amounting *only* to the sum of $290,200 were offered for exchange and *actually* surrendered and exchanged; and for which there were *actually* given in exchange *constitutional* bonds to the amount of $217,600; and *that beyond that sum* " *there has been no legal and proper issue of said bonds.*"

That the said *constitutional* bonds were, by law, entrusted to the care and custody of the State Treasurer, and same can only be *issued or used* by him in lawful and proper exchange for *consolidated* bonds in the manner aforesaid.

That, notwithstanding such legal impediments, said Burke, Treasurer, " did illegally and fraudulently embezzle and convert to his own use $71,000 of said *constitutional* bonds, taking same out of the treasury of the State and placing them, *after fraudulently numbering them,* in possession of divers persons, and among them M. J. Hart, and obtained large sums of money therefor, said Burke receiving a large portion of the money obtained.

" That said bonds are the property of the State of Louisiana, and represent, in value, the sum of $71,000, as well as (being) the evidence of the fact that $100,000 of valid consolidated bonds have been paid and destroyed.

" That the interest at the rate of 4 *per cent. per annum*, from January 1, 1880, has been paid on said fraudulent bonds, and collected from the State, which sum, together with said fraudulent bonds, should be returned to the State.

" That Burke thus delivered to the defendant $61,000 of said fraudulent constitutional bonds, which are represented by certain specified numbers, forty-four of which are alleged to be of the denomination of one thousand dollars each, and thirty-two of them of the denomination of five hundred dollars each.

" That said bonds had been pledged by Hart to various banks of the city of New Orleans, " but since the first day of September, 1890, at the call of the banks, he has *retaken possession* of said bonds, and same are now in his custody and control.

" That the bonds should be returned to the State treasury, where, as the property of the State, they of right belong."

The prayer of the petition is for the maintenance of the sequestration of the bonds, and for judgment condemning defendant to return the bonds and interest to the State treasury.

" Prefaced by a general denial, defendant's answer is that, at date of institution of this suit he was in possession of seventy constitutional bonds, being in part the bonds described in plaintiff's petition. It then gives a description and an enumeration of the bonds in his possession, which includes *all* of the five hundred dollar bonds, and thirty-eight of the one-thousand dollar bonds mentioned and described in plaintiff's petition—only omitting from the list the one thousand dollars bonds bearing the numbers 243, 244, 245, 246, 247 and 248, aggregating in amount $6000.

It avers that defendant acquired said bonds in due course of business, before their maturity in good faith, and for a full and valuable consideration. That same were and are negotiable instruments, and he can not be, in any manner, affected by any defects of title in any one from whom he acquired same.

It then proceeds to specify in detail the time, manner and circumstances under which he acquired same, a fair summary of which is, that during the winter and spring of 1888 he made to E. A. Burke sundry loans of money, aggregating $60,000 in amount, and for which loans Burke executed his demand notes, payable to defendant's order, to which said bonds, in similar amounts, were attached as collateral security; and that same were discounted at market rates prevailing at the time.

The answer further represents that the effort on the part of the State to recover the bonds is an attempt to impair the obligation of protected contracts existing between him and the State, and to divest him of his vested rights of property therein, in violation of the State and Federal Constitutions.

In reconvention, the defendant prays for the recognition of the bonds in suit as legal and valid obligations of the State, entitling him to hold and retain same in his possession in pledge to secure the amount of his loans to Burke, with interest and cost.

On the issues thus stated, the cause went to trial before a jury, and a verdict was rendered in favor of the State for the restitution of the bonds named without interest, and thereupon judgment was rendered accordingly against the defendant, commanding him to return same—rejecting and disallowing the State's demand for interest, and the defendant's reconventional demand.

After making an unsuccessful effort to obtain a new trial, defendant obtained and prosecutes this appeal; and, as this plaintiff has

made no answer to this appeal, requesting any amendment of the judgment appealed from, the questions for consideration are limited to two, viz.:

*First*—Whether the *constitutional* bonds in controversy were fraudulent and illegal in *their* inception and issuance, thus entitling the State to judgment declaring same absolutely null and void.

*Second*—Whether, in any court, the defendant is entitled to take judgment against the State, upon his reconvention demand—there being invoked no enabling statute authorizing him to sue the State.

In the petition of the State the issue is squarely made that the constitutional bonds sued for were absolutely illegal and void in their inception—the specific averment being, that they were entrusted to the custody and safe keeping of the Treasurer, for issuance in exchange for consolidated bonds, in pursuance of the constitutional debt ordinance; the same having been engraved, signed and sealed, previously, as directed by a special statute, as contemplated by said ordinance.

The further specific averment of the petition is, that there were $620,000, in amount, of bonds thus *prepared* and turned over to the Treasurer for purposes of exchange, but only *two hundred and ninety thousand two hundred dollars* of *consolidated* bonds were surrendered in exchange, and for which only *two hundred and seventeen thousand six hundred dollars* of constitutional bonds were *issued* legally and given in exchange; and "that beyond that sum there has been *no legal and proper issue of bonds.*"

That notwithstanding said constitutional bonds had only been entrusted to said Treasurer for the *single* purpose of effecting the exchange aforesaid, and same could only be issued, or used by him in making a lawful exchange, said Treasurer "did illegally and fraudulently embezzle and convert to his own use $71,000 of said constitutional bonds, taking same out of the treasury of the State, and placing them in the possession of divers persons, and among them M. J. Hart (the defendant), and obtained large sums of money therefor, said Burke (Treasurer) receiving a large portion of the money obtained."

That is to say, that whilst the [bonds in question were perfect in form and possessed of all the *indicia* of legal and valid constitutional bonds, yet they were only entrusted to the State Treasurer for the purpose of exchanging them for consolidated bonds, and that the

Treasurer embezzled them and put them in circulation fraudulently and surreptitiously, *without any constitutional bonds having been received in exchange therefor—that is to say, without consideration.*

In the petition it is further alleged that upon the face of each one of said constitutional bonds there are two spaces or shields left blank when same were delivered into the custody and possession of the Treasurer, same being intended by the terms of the statute in question for the number of the *consolidated* bond surrendered to be placed in one, and the number of the *constitutional* bond issued in exchange therefor to be placed in the other, and that said Burke, Treasurer, falsely and fraudulently forged the numbers in the said constitutional bonds that he embezzled, in order to give them the appearance of having been validly and legally issued in exchange for consolidated bonds, when in fact they were not.

On the trial the validity of the bonds at date of their issuance was the question principally mooted, and with regard to which a large amount of evidence was taken.

In the brief of the Attorney General is given a full and complete *résumé* of this evidence, and we have embodied it as the most accurate way of conveying an idea of it.

It is as follows:

CONSTITUTIONAL BONDS HELD BY M. J. HART, AND NOW IN POSSESSION OF THE SHERIFF UNDER WRIT OF SEQUESTRATION.

| Constitutional Bond. | Purporting to have been | |
|---|---|---|
| No. 199 for $1000 | Exchanged for C. B. 1751 (No such bond was ever exchanged.) | Pledged by Hart to Germania Savings Bank. |
| | Purporting to have been | |
| No. 198 for $1000 | Exchanged for C. B. 251 (No such bond was ever exchanged.) | Pledged by Hart to Union National Bank. |
| | Purporting to have been | |
| No. 201 for $1000 | Exchanged for C. B. 5606 This bond 5606 was delivered for exchange to E. A. Burke by First National Bank of Baton Rouge. July 6, 1883, together with other bonds and constitutional bonds given in exchange. It was not destroyed. It was pledged by M. J. Hart to Henry Bier, December, 1885, with No. 13 coupon. Coupon No. 25 was with Cockerton in August, 1886, and it is now held by Nathan Simmons | Pledged by Hart to Bank of Commerce. |
| | Purporting to have been | |
| No. 203 for $1000 | Exchanged for C. B. 3434 This bond was exchanged by Citizens Bank in 1880 and destroyed May 6, 1882. | Pledged by Hart to Bank of Commerce. |
| | Purporting to have been | |
| No. 204 for $1000 | Exchanged for 3435 C. B. Do. as above No. 203 | |

State vs. Hart.

No. 205 for $1000............Purporting to have been Exchanged for C. B. 3436............Pledged by Hart to Bank of Do. as above No. 203    Commerce.

No. 207 for $1000............Purporting to have been Exchanged for C. B. 7487...........Pledged by Hart to Hibernia National Bank. (No such bond was ever exchanged.)

No. 209 for $1000............Purporting to have been Exchanged for C. B. 7777...........Pledged by Hart to Bank of (This bond was exchanged by    Commerce. Hill, Garten & Co., of New York, in 1880, and destroyed May 6, 1882.)

No. 210 for $1000 ............Purporting to have been Exchanged for C. B. 5238............Pledged by Hart to Bank of (This bond was exchanged by    Commerce. Stauffer & Macready in 1880, and destroyed May 6, 1882.)

Constitutional Bond.    Purporting to have been
No. 211 for $1000............. Exchanged for C. B. 9188............Pledged by Hart to Hibernia National Bank. (This bond was exchanged by G. Townsend in 1880 and destroyed May 6, 1882.)

No. 212 for $1000 ............Purporting to have been Exchanged for C. B. 6539...........Pledged by Hart to Bank of (This bond was exchanged by    Commerce. G. Townsend in 1880 and destroyed May 6, 1882.)

No. 213 for $1000............Purporting to have been Exchanged for C. B. 7513...........Pledged by Hart to Hibernia National Bank. (This bond was exchanged by G. Townsend in 1880 and destroyed May 6, 1882.)

No. 214 for $1000 ............Purporting to have been Exchanged for C. B. 2488 ..........Pledged by Hart to Bank of (This bond was exchanged by    Commerce. G. Townsend in 1880 and destroyed May 6, 1882.)

No. 215 for $1000 .... ....... Purporting to have been Exchanged for C B 4151.... ....Pledged by Hart to Hibernia National Bank. (This bond exchanged by Wm. Grant in 1880 and destroyed on May 6, 1882.)

No. 216 for $1000........ .....Purporting to have been Exchanged for C. B. 7892 .... .....Pledged by Hart to Hibernia National Bank. (This bond exchanged by Wm. Grant as above and destroyed May 6, 1882.)

No. 217 for $1000 ............Purporting to have been Exchanged for C. B. 4411............Pledged by Hart to Hibernia National Bank. (This bond exchanged by Stauffer & Macready in 1880 and destroyed May 6, 1882 )

No. 218 for $1000 ............Purporting to have been Exchanged for C. B 5238 ...........Pledged by Hart to Hibernia National Bank. (This bond exchanged by Stauffer & Macready in 1880 and destroyed May 6, 1882 )

No. 219 for $1000 .... .......Purporting to have been Exchanged for C. B 1710.... ....Pledged by Hart to Bank of Commerce. (This bond was exchanged by Wm. Grant in 1880 and destroyed May 6, 1882.)

Constitutional Bond.    Purporting to have been
No. 220 for $1000............Exchanged for C B. 6930 .... .....Pledged by Hart to Germania Savings Bank. (This bond was exchanged by G. Townsend in 1880 and destroyed May 6, 1882.)

No. 221 for $1000 ............Purporting to have been Exchanged for C. B. 5609 .... .....Pledged by Hart to Hibernia National Bank. (This bond was exchanged by First National Bank of Baton Rouge, July 6, 1883; turned over to Burke; never destroyed. It was pledged by Hart to Bier in December, 1885, with coupon 13. Cockerton had coupon 25 in August, 1886. Now held by A. Luria for account of Oglesby, Jr.)

State vs. Hart.

No. 224 for $1000 ..............Purporting to have been Exchanged for C. B. 563 .............Pledged by Hart to Hiber
(This bond was exchanged by      nia National Bank.
G. Townsend in 1880 and de-
stroyed May 6, 1882.)

No. 226 for $1000 ..............Purporting to have been Exchanged for C. B. 529..............
(No such bond was ever ex-
changed and is outstanding.)

No. 227 for $1000 ..............Purporting to have been Exchanged for C. B. 5614 ...........
(This bond was exchanged by
First National Bank of Baton
Rouge, July 6, 1883; never de-
stroyed.)
Coupon No. 25 with Cockerton,
August, 1886.

No. 228 for $1000 ..............Purporting to have been Exchanged for C. B. 5609............
(Same as above No. 221; this
number duplicated.)

No. 229 for $1000 ..............Purporting to have been Exchanged for C. B. 5607............
(This bond was exchanged by
First National Bank of Baton
Rouge, July 6, 1883; turned over
to Burke; never destroyed,)
Coupon No. 25 with Cockerton,
August, 1886.

No. 230 for $1000 ..............Purporting to have been Exchanged for C. B. 5607............
(Identical with 229. Dupli-
cated.)

Purporting to have been
No. 231 for $1000 ..............Exchanged for C. B. 2227 .........
No. 232 for $1000 ..............Exchanged for C. B. 1778............
No. 233 for $1000 ..............Exchanged for C. B. 234............
No. 234 for $1000 ..............Exchanged for C. B. 2663 ...........
No. 235 for $1000 ..............Exchanged for C. B. 3443 ...........
No. 236 for $1000 ..............Exchanged for C. B. 3937............
No. 237 for $1000 ..............Exchanged for C. B. 1716............
No. 238 for $1000 ..............Exchanged for C. B. 4281............
No. 239 for $1000 ..............Exchanged for C. B. 1408............
No. 240 for $1000 ..............Exchanged for C. B 1650............
No. 241 for $1000 ..............Exchanged for C. B. 7183............
No. 242 for $1000 ..............Exchanged for C. B. 1751............

None of these Consolidated Bonds were exchanged, and are outstanding.

| Constitutional Bond | | Purporting to have been ex- changed for Consolidated Bond | This Bond exchanged by First National Bank, | | | Pledged by M. J. Hart to Hibernia National Bank. | |
|---|---|---|---|---|---|---|---|
| No. 36 for $500 | | 532 | Baton Rouge, July 6, 1883. | " | " | " | " |
| " 37 | " | 531 | " | " | " | " | " |
| " 38 | " | 529 | " | " | " | " | " |
| " 39 | " | 529—Duplicate. | " | " | " | " | " |
| " 40 | " | 2439 | " | " | " | " | " |
| " 43 | " | 981 | Never exchanged. | | " | " | |
| " 44 | " | 982 | " | " | " | " | |
| " 45 | " | 4308 | " | " | " | " | |
| " 50 | " | 250 | Exchanged by State Na- tional Bank. | | " | " | |
| " 51 | " | 686 | Exchanged by Stauffer, Macready & Co. | | " | " | |
| " 52 | " | 1638 | Exchanged by Wm. Grant | | " | " | |
| " 53 | " | 1705 | Exchanged by State Na- tional Bank. | | " | " | |
| " 55 | " | 635 | Never exchanged. | | | | |
| " 57 | " | 847 | " | " | | Pledged by Hart to Bank of Commerce. | |
| " 58 | " | 715 | " | " | | | |
| " 59 | " | 633 | Exchanged by Wm. Grant | | " | " | |
| " 60 | " | 237 | " | " | " | Pledged by Hart to Bank of Commerce. | |
| " 61 | " | 996 | " | " | " | | |

State vs. Hart.

| No. 62 for $500 | 1713 | Exchanged by State National Bank. | |
|---|---|---|---|
| " 63 " | 1711 | Exchanged by State National Bank. | |
| " 64 " | 1709 | Exchanged by State National Bank. | Pledged by Hart to Bank of Commerce. |
| " 65 " | 1707 | Exchanged by State National Bank. | Pledged by Hart to Bank of Commerce. |
| " 66 " | 4308—Duplicate. Never exchanged. | | |
| " 67 " | 1826 | " " | |
| " 68 " | 1964 | " " | This is a Seminary bond and now held by Germania Savings Bank. |
| " 69 " | 3471 | " " | |
| " 70 " | 1270 | " " | |
| " 71 " | 3472 | " " | |
| " 72 " | 2439 | " " | |
| " 73 " | 2440 | " " | |
| " 74 " | 532—Duplicate. Exchanged by State National Bank. | | |
| " 75 " | 531—Duplicate. Exchanged by State National Bank. | | |

RECAPITULATION.

38 Consolidated Bonds of $1000.................................................................$38,000
32 Consolidated Bonds of $500............................................................ 16,000—$54,000

The defendant does not seriously contest the facts enumerated, but rests his defence mainly on his alleged acquisition of the bonds in market overt and in good faith—they possessing all the *indicia* of valid and legal commercial instruments, entitling them to full faith and credit in commercial transactions—and that the effort of the State to recover them is an attempt to impair them as contracts protected under the State and Federal Constitutions.

Counsel for the defendant insist that the question presented for solution is *res nova*, and not covered by our decision in Pugh vs. Moore, Hyams & Co., 44 An. 209; and in their brief they insist that neither that case or any other decision of this court has involved the question in controversy.

In the Pugh case the court had under investigation that series of bonds known as the Agricultural and Mechanical College bonds, claim being made that same had been rendered void by the precept of the 233d article of the Constitution of 1879—same being consolidated bonds that were regularly and legally issued under and in pursuance of the funding laws, sanctioned by a constitutional amendment, and had, prior to the adoption of the Constitution of 1879, formed a part of bonded debt of the State.

The case of Herwig vs. Richardson & May, 44 An. 703, adopts and follows the opinion in the Pugh case, as it treats of Agricultural and Mechanical College bonds likewise.

Hence our conclusion is that defendant's counsel is correct in stating the question to be *res nova*, but in our view the situation and strength of his defence is not improved thereby.

It is the recognized and fundamental doctrine of the law merchant, and accepted by text writers and acted upon by the courts of the country, that the holder of a negotiable instrument is one who has acquired it in good faith for a valuable consideration from one capable of transferring it in the ordinary course of business, without notice of facts which impeach its validity as between antecedent parties; that such a holder possesses a title unaffected by those facts and may recover on the instrument, although it may be without any legal validity as between antecedent parties; even though it was originally *obtained* by fraud, theft or robbery.  1 Daniels on Negotiable Instruments, Sec. 769.

That author further states the doctrine thus:

" It is to be observed, as a general rule, the purchaser can never be placed on a worse footing than his transferrer, although he himself could not, in the first instance, have acquired the vantage ground occupied by such transferrer.

"And, therefore, even if he have notice that there was fraud in the inception of the paper, or that it was lost or stolen, or that the consideration had failed between some antecedent parties, or the paper be overdue and dishonored, he is, nevertheless, entitled to recover, provided his immediate vendor be a *bona fide* holder for value unaffected by any of these defences."   *Id.* 803.

That principle is recognized in Commissioners vs. Clark, 94 U. S. 285, and sanctioned by us in Levy vs. Ford, 41 An. 870.

Thus it appears that the possessor of a negotiable instrument by such title is fully protected against charge of fraud, or theft, or failure of consideration between antecedent parties, and that the rule of property in such paper is so strong that such holder can convey to another a valid and indefeasible title, although the latter *knew* of its inherent defects.

But the learned author also states an important exception to that rule.  He says:

" That *suspicion* of defect of title, or knowledge of circumstances which could excite suspicion in the mind of a prudent man, or gross negligence on the part of the taker at the time of the transfer, will not defeat his title,   *   *   *   subject to the following modifications, or qualifications, viz.:

" 1. That when it is shown by the defendant that the instrument *originated* in fraud or illegality; the burden of proof will be shifted

to the holder, and he must then prove that he is a *bona fide* holder for value.

"2. Where it is shown that the instrument was *given* for *a consideration which, by statute, is declared void, the original taint follows it, and it is void in the hands of every holder, however innocent.* And that *no party can enforce* a negotiable instrument if it *be not genuine, or if it be executed by a party incapable of entering into the contract in which it was given.*" (Our italics.) Id., Secs. 769, 806.

The author generalizes the principle and says:

· "But the rule of the text is, we think, in conformity with the current and weight of authority and the law merchant. The fraud which shifts the burden of proof must have been in the *consideration, or representations used in obtaining the execution* of the instrument, and *not in the after breach of trust in diverting it from the uses for which it was intended.*" *Id.*, Sec. 791.

This distinction has been taken, substantially, in many reported cases: Jackson vs. Commercial Bank, 2 R. 128; Dick vs. Leverich, 11 La. 573; Merchants Bank vs. Exchange Bank, 16 La. 457; Bullitt vs. Howell, 11 An. 327.

It has also been taken by the Supreme Court in many cases: Otis vs. Cullom, 92 U. S. 447; Orleans vs. Platt, 99 U. S. 679; Shaw vs. Railroad Company, 101 U. S. 557; Collins vs. Gilbert, 94 U. S. 753; Cromwell vs. County of Sac., 96 U. S. 59.

It is also succinctly stated in a recent treatise on commercial paper that "in order to constitute a valid security, *any bond or negotiable obligation of the State must be issued on authority of the Constitution and statute law.*" 1 Randolph on Commercial Ins., Sec. 348.

And the same author lays down the general proposition that the powers and duties of officers and agents "of the government, whether Federal or State, are defined by statute, which is notice to the world of the limitations of their authority." *Id.*, Sec. 440.

He also announces the principle that "the defence of *original want of authority to issue a bond is available against all holders.*" *Id.*, Sec. 343.

On the facts above enumerated and on the various authorities cited, we are of opinion that the bonds sought to be recovered of the defendant were absolutely void in their incipiency, having been *issued* by E. A. Burke, Treasurer, without authority of law and in violation of the law—constitutional and statutory—authorizing their

issuance, in exchange for consolidated bonds duly and lawfully surrendered.

It has been clearly shown that they originated in fraud and issued by a person incapable, under the law, of entering into such a contract on the part of the State as they represent, same having been issued without the sanction or authority of the State. And it was the manifest and evident duty of all persons dealing in this exceptional class of commercial paper to take notice of the laws authorizing its issuance; such laws operating full notice to them of the manner and circumstances of their issuance and of the limitations that the law imposes upon the officers authorized to issue them.

In such case the original taint follows the instrument and renders it void in the hands of every holder, however innocent.

Hence the defence of *bona fides* can not avail the defendant—it being matter of no consequence that he acquires the bonds for a valuable consideration before maturity and without notice of the original informality of their issuance.

Counsel insist, however, that the statute authorizing the issuance of constitutional bonds gave to the Treasurer unlimited authority in the premises, and conferred upon him the power—without the concurrence or knowledge of any other officer—to issue such bonds in exchange for consolidated bonds, and that he was required to keep no record whatever of the fact, or manner of making the exchange; nor was he required to perform any given ceremony, or *formula,* "save the trifling one of identifying the new bond with the old one for which it was exchanged, by placing a number on the new bond, the same as the one upon the bond for which it was given."

But this was not a "*trifling*" ceremony by any means. On the contrary, it was of the utmost consequence and importance. The numbers placed on the shields or spaces left blank in the bonds when delivered to the Treasurer furnished the *only* means of identifying one *constitutional* bond from another, and furnished the only evidence of his faithful performance of duty in obtaining a *consolidated* bond in exchange therefor. The surrender of the consolidated bond was the only consideration there was for the constitutional bond; and when the Treasurer entered false and fictitious numbers in those spaces, or shields, he was, to all intents and purposes, guilty of a forgery. *Vide* Benson vs. McMahon, 127 U. S. 468, and authorities therein cited.

The constitutional bond being intended for exchange for a consolidated bond, same was not complete and perfect until the *exchange* had taken place and the number of the consolidated bond surrendered had been entered in the appropriate shield, as the law required, as evidence of such exchange having taken place.

Until this was done the constitutional bond did not become complete and perfect evidence of an obligation on the part of the State. That was requisite to make it an unconditional promise to pay.

In this we find an essential distinction between the constitutional bond in question and the United States treasury notes that were involved in Cook vs. United States, 91 U. S. 390; for, in that case, it was a fact conceded, that if the notes were *genuine* and unlawfully put in circulation, the government was bound for their payment to a *bona fide* holder; and the court said the notes were perfect and complete as soon as printed; that they did not require the signature of any officer; that "as soon as they had received the impression of all the plates and dies *necessary to perfect their form* they were ready for circulation and use," putting their opinion evidently upon the ground that the notes were *perfect* in form antecedent to time of their issuance. Consequently those notes did not come within the principle announced by Mr. Daniels, as being fraudulent in inception.

The defendant's counsel insist that the record furnishes no evidence of the bonds having been issued without consolidated bonds having been given in exchange therefor; and they deny the sufficiency of the proof which the Attorney General claims to have made by the introduction in evidence of a record found in the treasurer's office of the exchange of bonds, such record being unofficial, same not being by law required to be kept.

But the then Auditor, as a witness states, that the bond book contemplated and required by the act authorizing an exchange of bonds, to be kept by the Treasurer in the treasurer's office, was missing, and could not be found after diligent examination. He identifies an original list of the bonds exchanged as the one found in the treasurer's office—that is to say, the list of consolidated bonds that were surrendered, and are supposed to be destroyed. This list is denominated "Campbell's list," and was obtained from the treasurer's office at the expiration of the treasurer's term of office. The *data* furnished by this list is corroborated by the testimony of the clerk

who assisted the treasurer in effecting the exchanges that were made, and his testimony makes it evident that the bonds in controversy were fraudulently issued, without any consideration whatever.

We are unable to find in the record any evidence of the defendant's possession of the bonds numbered respectively 243, 244, 245, 246, 247 and 248. These numbers are not included in the list of bonds furnished by the Attorney General as those held by the defendant and in possession of the sheriff under the writ of sequestration.

Hence we are of opinion that same were incorrectly included in the verdict and judgment, which is, in other respects, correct.

In so far as the defendant's reconventional demand is concerned, little need be said, for the reason that it merely alleges the legality and binding force of the bonds in his hands as obligations of the State. And inasmuch as, in the course of our opinion on the merits of the principal demand, we were necessitated to pass upon the *primary validity* of the bonds, there is nothing left in the reconventional demand to decide. We therefore pretermit any expression of opinion on the question of law raised with regard to the jurisdiction of this court, under the circumstances of this case, to render a judgment against the State without the sanction of the General Assembly.

The judgment should be amended and affirmed.

It is therefore ordered, adjudged and decreed that the judgment appealed from be so amended as to reject and disallow the plaintiff's demand in respect to bonds numbered, respectively, 243, 244, 245, 246, 247 and 248, for one thousand dollars each, and that in all other respects the same be affirmed—the defendant being exonerated from the payment of the costs of appeal.

Mr. Justice Parlange not being a member of this court at time of the argument and submission of this cause takes no part in the decision.

Mr. Justice McEnery absent, sick.